**UNITED STATES of America**

v.

**Joseph Daniel EDGERTON, Jr., et al.**

**Crim. No. HM82–00007.**

United States District Court,
D. Maryland.

Sept. 1, 1982.

**740**

J. Frederick Motz, U. S. Atty., D. Md., Asst. U. S. Attys. James P. Ulwick and Lawrence L. Hooper, Jr., Baltimore, Md., for the U. S.

Stanley H. Needleman, Baltimore, Md., for defendant Joseph Daniel Edgerton, Jr.

HERBERT F. MURRAY, District Judge.

On February 17, 1982 defendant Joseph Daniel Edgerton, Jr. was indicted, along with three co-defendants [1], for conspiracy to possess with intent to distribute marijuana in excess of 1000 pounds, and actual possession with intent to distribute such marijuana. Edgerton was tried alone, after the court severed his trial from that of his co-defendants. At the close of the government's case in chief, and again at the close of all the evidence, defendant Edgerton moved for a judgment of acquittal, claiming that the evidence was insufficient to show that he engaged in the alleged conspiracy. Both motions were denied and the jury found defendant guilty on both counts.

Pursuant to Rule 29(c) of the Federal Rules of Criminal Procedure, defendant Edgerton now renews his motion, asking the court to set aside his guilty verdict and enter a judgment of acquittal. Defendant Edgerton reiterates his contention that the evidence is insufficient to show that he was involved in the alleged conspiracy.

The test for deciding a motion for judgment of acquittal is "whether there is substantial (direct or circumstantial) evidence which, taken in the light most favorable to the United States, tends to show that the defendant is guilty beyond a reasonable doubt." *United States v. Stroupe,* 538 F.2d 1063 (4th Cir. 1976).

Initially, the court notes that the conspiracy charged in the indictment was proven to exist beyond any reasonable doubt. The evidence adduced at trial, primarily from agents of the Drug Enforcement Administration (DEA), demonstrated that during the fall of 1981, Special Agent O'Leary, acting in an undercover role, had a number of conversations with Mr. Freeman. During these conversations, Freeman revealed that he was involved in large scale distribution of marijuana and that he desired to purchase a large quantity of high quality marijuana. Negotiations between Special Agent Athas, who was also acting in an undercover capacity, and Freeman, resulted in an agreement by Freeman to purchase approximately one ton of marijuana at a stated price. The details of the deal included a cash down payment of $100,000 by Freeman, with the remaining payments on the shipment to be made on a consignment basis.

Mr. Freeman and Agent Athas arranged to have Agent O'Leary and his confederates view the $100,000 in cash prior to Agent O'Leary directing Freeman and his confederates to the location of the marijuana. Thus, on December 8, 1981, Messrs. Freeman, Tatum and Jones met Agent O'Leary and other DEA agents at a location in Baltimore County. At the meeting, Freeman told Tatum to display a briefcase full of currency to the agents. After Tatum opened the briefcase to show Agent O'Leary the money, Agent O'Leary, by means of a prearranged signal, notified the other DEA agents who were present at the scene that Tatum had in his possession what appeared to be $100,000. Tatum then left the area in Freeman's BMW, taking the money with him.

Agent O'Leary, with Freeman and Jones following him, then departed for the location where the marijuana was stored. On

1. Indicted along with defendant Edgerton were Calvin Freeman, Dwight Jones and Nathaniel Tatum.

the way, Agent O'Leary picked up Agent Athas. After about a twenty-minute drive, the parties arrived at a farm in Carroll County. The bales of marijuana were stored in a barn on the farm. Jones and Freeman cut open several of the bales and tested the marijuana for quality by rolling and smoking a couple of marijuana joints. After agreeing that the quality was sufficient, Jones and Freeman loaded their camper truck with the marijuana. Upon completing the loading of the vehicle, Jones and Freeman left the farm, but were arrested by DEA agents and Maryland police close to the farm entrance. A handgun was discovered upon Freeman. The bales of marijuana and the camper truck were also seized.

Meanwhile, Agents Santos and Coleman followed Tatum from the original meeting point and, after a short period of time, pulled him over. At the time of his arrest, Tatum appeared to be reaching under the front seat of the automobile for something. An immediate search of the front seat area revealed a loaded cocked automatic handgun. A further search of the interior of the automobile revealed the briefcase full of money, which the agents had earlier observed.

The principle issue is whether sufficient evidence for the jury to consider was presented at trial to show that defendant Edgerton was a member of this conspiracy. In analyzing this issue, the court finds it useful to quote from the opinion of the Fourth Circuit in *United States v. Laughman,* 4 Cir., 618 F.2d 1067, 1075, *cert. denied,* 447 U.S. 925, 100 S.Ct. 3018, 65 L.Ed.2d 1117 (1980):

> Simply proving the existence of a conspiracy, however, cannot sustain a verdict against an individual defendant. There must also be a showing of that defendant's knowledge of the conspiracy and some action indicating his participation. These elements, knowledge and participation, may also be proven by circumstantial evidence.

Accordingly, we must review the evidence against each appellant and determine whether it is sufficient to sustain a conspiracy conviction. In doing so, we shall bear in mind that the evidence and all reasonable inferences arising from it must be viewed in the light most favorable to the government, the prevailing party. Our initial inquiry in determining whether, on review the evidence was sufficient to support a criminal conviction is whether after 'viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

Once the existence of a conspiracy is established, the government argues, the evidence need only establish a "slight connection" of the defendant with the conspiracy. *United States v. Seni,* 662 F.2d 277, 285 n. 7 (4th Cir. 1981), cert. denied, —— U.S. ——, 102 S.Ct. 1453, 71 L.Ed.2d 664 (1982). The court's understanding of the "slight connection" rule accords with its articulation by the Ninth Circuit in *United States v. Dunn,* 564 F.2d 348, 357 (1977):

> Once the existence of a conspiracy is established, evidence establishing beyond a reasonable doubt a connection of a defendant with the conspiracy, even though the *connection* is *slight,* is sufficient to convict him with knowing participation in the conspiracy. Thus, the word "slight" properly modifies "connection" and *not* "evidence". It is tied to that which is proved, not to the type of evidence or the burden of proof.

The evidence against Edgerton was entirely circumstantial.[2] The government introduced four separate pieces of evidence to attempt to prove Edgerton's connection to the conspiracy.

First, the government introduced at trial the results of a court approved pen register

---

**2.** During the time period of the alleged conspiracy, October 1 to December 8, 1981, Edgerton was never seen in the presence of any of the alleged co-conspirators, was never present at any of the meetings with the agents where the drug deal was discussed, and never spoke with any of the agents on the telephone. Nor was he present on the day of the drug transaction.

which was placed on Mr. Freeman's telephone. Preliminarily, the court notes that the data provided by a pen register is limited. The pen register merely records that a call was made from one telephone to another telephone at a certain time. It does not identify the caller, the recipient, nor, of course, the substance of the conversation.

The pen register placed on Mr. Freeman's telephone logged a number of telephone calls from the Freeman residence to the Edgerton residence during the time period of the alleged conspiracy. Defendant Edgerton argues that no adverse inference may be drawn from these telephone calls because he and Mr. Freeman and their wives are all good friends. The government argues that the timing of certain of the calls from the Freeman household to the Edgerton household raises an inference that Edgerton was a member of the conspiracy.

The government argues, for example, that in November 1981, according to the testimony, Agent Athas telephoned Freeman from Florida. Agent Athas told Freeman that he had seen the marijuana, and that it met Freeman's requirements. Agent Athas asked Freeman if he wanted the marijuana. Freeman told Athas he would buy it. Minutes after this phone call concluded, the pen register reflects a telephone call from Mr. Freeman's residence to Mr. Edgerton's residence. On December 7, 1981, Agent Athas called Freeman at home to inform him that the deal was ready to be completed. The pen register reflects an immediate call from Freeman's residence to Edgerton's residence upon the conclusion of the Athas-Freeman conversation. The government contends that a reasonable inference exists that Freeman made these telephone calls to Edgerton to discuss the drug deal.

Evidence garnered from DEA surveillance of defendant Freeman also was introduced at Edgerton's trial. On December 7, 1981, the day before the transfer of the marijuana was made, Freeman met with the agents and agreed to purchase the marijuana for $100,000 down, and to pick up a portion of the marijuana the next day. The purchase was set for 12:00 noon the next day. Freeman was surveilled after this meeting, and he proceeded directly to Edgerton's residence and went inside. The government produced no evidence to show that Edgerton was present when Freeman visited his home, while the defense produced uncontradicted testimony that defendant Edgerton was at a work-related seminar in Washington, D.C. at the time that Freeman visited his home on December 7, 1981. Nevertheless, the government submits that the only reasonable inference available from Freeman's visit is that Freeman and Edgerton were going over final arrangements for the drug buy.

Next, the court, pursuant to Rule 801(d)(2)(E) of the Federal Rules of Evidence, permitted the agents to testify to several out-of-court statements made by defendant Freeman to them which implicated Edgerton. During discussions with the agents, Freeman referred to Edgerton as "his partner", suggested that meetings with the agents be held at "Danny's house", and told the agents on December 8, 1981, the day of the drug transfer, that "Danny" wished he could be there, but that he couldn't get off work. At Edgerton's trial, Freeman testified that these statements were untrue, that they constituted a ruse to mislead the agents into thinking he had additional "protection" on his side and was not operating alone, and that Edgerton did not know about nor participate in the conspiracy.

■ Rule 801(d)(2)(E) permits the admission of a co-conspirator's out-of-court assertions as nonhearsay evidence if the prosecution proves that the conspiracy existed, that the defendant had a connection with the conspiracy, and that the co-conspirator made the statements during the course of and in furtherance of the conspiracy. The judge, rather than the jury, decides whether a co-conspirator's statements should be admitted into evidence. *United States v. Jones,* 542 F.2d 186, 203 (4th Cir.); *cert. denied,* 426 U.S. 922, 96 S.Ct. 2629, 49 L.Ed.2d 375 (1976).

To secure the admission into evidence of Freeman's statements, the prosecution had to meet the three requirements of Rule 801(d)(2)(E). As discussed earlier in this opinion, the prosecution had clearly met the first requirement by proving beyond a reasonable doubt the existence of a conspiracy. To meet the second requirement, the prosecution needed to present independent evidence, other than the alleged co-conspirator statements themselves, of the defendant's participation in the conspiracy. *United States v. Gresko,* 632 F.2d 1128 (4th Cir. 1980). The proof of a defendant's connection with the conspiracy, in order to permit the admission into evidence against a defendant of declarations made by co-conspirators, must be made by a fair preponderance of the independent, nonhearsay evidence. *United States v. Jones,* 542 F.2d 186, 203 (4th Cir.); *cert. denied,* 426 U.S. 922, 96 S.Ct. 2629, 49 L.Ed.2d 375 (1976). Freeman's statements were properly admissible against Edgerton, assuming the other requirements of Rule 801(d)(2)(E) were met, if the independent, nonhearsay evidence, consisting of the results of the pen register and the DEA surveillance of Freeman, proved by a fair preponderance of the evidence that Edgerton was a member of the conspiracy. The court, upon reflection, concludes that the pen register and surveillance evidence fails to satisfy this test. Instead, that evidence merely raises a suspicion of Edgerton's involvement in the conspiracy. The pen register does not reflect who initiated the telephone calls from the Freeman household nor who answered them at the Edgerton household. Mr. Freeman may have spoken with Mrs. Edgerton. Mrs. Freeman may have spoken with Mr. or Mrs. Edgerton. Even assuming that Mr. Freeman talked with Mr. Edgerton, the subject of the conversation might have been entirely unrelated to the conspiracy. That Mr. Freeman and Mr. Edgerton discussed how to handle the proposed drug deal is one possibility. But the evidence of Mr. Edgerton's involvement in the conspiracy must rise to the level of probability. Possibility is not enough. Mr. Freeman's visit to the Edgerton home on December 7, 1981 is equally subject to many possibilities. Assuming Mr. Edgerton was home, it is only one possibility out of a multitude of possibilities that Freeman and Edgerton discussed the impending drug transaction. The independent, nonhearsay evidence fails to demonstrate by a preponderance of the evidence that Mr. Edgerton was a member of the conspiracy. Accordingly, Mr. Freeman's statements implicating defendant Edgerton were not properly admissible against him and will not be considered by the court in ruling upon the motion for judgment of acquittal.

The government introduced one final piece of evidence to demonstrate Edgerton's involvement in the alleged conspiracy. The court admitted the testimony of one J.W. Burke, a government informant, about previous marijuana transactions between Burke, Freeman and defendant Edgerton. Mr. Burke testified that for a lengthy period of time, Freeman, Edgerton and he had dealt in illegal narcotics. Specifically, Burke described the way the three of them had executed these transactions and described their roles. Mr. Burke testified that Freeman always negotiated the purchase of the marijuana. Upon negotiation of a purchase, Freeman would telephonically advise Burke and Edgerton that he had negotiated a purchase. Subsequently, Burke and Edgerton would meet Freeman at a location chosen by him, and load their portion of the marijuana into their Chevrolet Blazer pickup trucks. Although they did not share the proceeds or the marijuana equally, Burke testified that he, Freeman and Edgerton were "partners". In support of Burke's testimony, the government introduced documents showing Burke and Edgerton purchasing their Chevrolet Blazers at the same dealership on the same day and referencing Mr. Freeman.

At the time the government offered this evidence, defendant Edgerton objected. The government stated that this evidence was offered pursuant to Rule 404(b) to show defendant Edgerton's knowledge of the offense charged in the indictment, his intent to participate therein, and that the

instant conspiracy was part of a common scheme or plan. The court held that the evidence was admissible pursuant to Rule 404(b).

Rule 404(b) provides as follows:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

In charging the jury on this point, the court was guided by the "similar acts" jury instruction promulgated by the Fifth Circuit (Pattern Jury Instructions—Criminal Cases, U.S. Fifth Circuit Judges Ass'n, West Publishing Co., 1979 at 42–3).[3] The government did not object to this jury instruction when the court advised counsel that it would be read to the jury or when it was in fact given.

The government now argues that defendant Edgerton received a more favorable instruction than he was entitled to and that other trial judges have been upheld when they instructed the jury that it might consider similar act testimony to establish a defendant's participation in a conspiracy without requiring preliminary proof of the other elements of the crime. Therefore, the government argues, the jury may have chosen to ignore the court's instruction and instead rely upon the similar act testimony of Mr. Burke to establish defendant's knowledge and participation.

The court is not persuaded by the government's argument. First, it is hornbook law that in a criminal case, a party's failure to request a different charge or to make a timely objection to the charge given, operates as a waiver. Rule 30, Federal Rules of Criminal Procedure; *see e.g., United States v. Sorenson,* 611 F.2d 701 (8th Cir. 1979). The instruction given is a correct statement of the law and thus not plain error. *Id.* at 702; *United States v. Haynes,* 554 F.2d 231, 234 (5th Cir. 1977). Second, the court can see no purpose in speculating about whether the jury disregarded the instructions when it considered the similar act testimony of J.W. Burke. The judicial system operates on the well-founded assumption that juries follow the instructions of the court.

In conclusion, the government's evidence, even taken in its most favorable light, fails to show that the defendant Edgerton was guilty beyond a reasonable doubt of either of the crimes charged.[4] The pen register and surveillance evidence do not even make it more probable than not that Edgerton was a member of the conspiracy. The co-conspirator statements by Freeman should not have been admitted at trial. Under the jury instruction which was given and not objected to, the jury could only consider the similar act testimony of J.W. Burke after it was satisfied that he was a member of the conspiracy. Another court eloquently set forth some of the guiding principles of conspiracy law a court should consider when confronted with a motion for judgment of acquittal:

---

**3.** The charge given was as follows:

In this case you've heard evidence of prior association between Calvin Freeman, Joseph Daniel Edgerton and J.W. Burke, Jr. at a point in time earlier than the time period in the indictment from October 1, 1981 to December 8, 1981. I want to explain the purposes for which you may consider such evidence if you accept it as true.

First I want to emphasize it was not admitted as evidence bearing on the commission of the crimes charged in the indictment. It is outside the time period covered in the indictment. You must find the government has proved beyond a reasonable doubt the commission of the crimes alleged. If you are satisfied from the other evidence in the case that the crimes were com-

mitted, the evidence of prior association of Freeman, Burke and Edgerton is admissible under the Federal Rules of Evidence to show intent, preparation, plan, knowledge, identity or absence of mistake or accident by the defendant in the commission of the crimes charged in the indictment.

**4.** The government's failure to prove the necessary elements of count one, the conspiracy count, against defendant Edgerton, necessitates the dismissal of count two, which charged Edgerton as a co-conspirator with responsibility for a subsequent crime committed by one of the co-conspirators in furtherance of the conspiracy.

A suspicion, however strong, is not proof and will not serve in lieu of proof. Charges of conspiracy are not to be made out by piling inference upon inference. Guilt of conspiracy may not be inferred from mere association. It is true that the proof may be circumstantial or direct or both, but it must convince beyond a reasonable doubt that a conspiracy existed, that the defendant knew it, and with that knowledge intentionally did some act or thing to further or carry on that conspiracy.

*Causey v. United States,* 352 F.2d 203 (5th Cir. 1965). In the present case, a suspicion of Mr. Edgerton's involvement in the conspiracy based on his association with Mr. Freeman, provides insufficient evidence to uphold a guilty verdict.

Accordingly, it is this 1st day of September 1982, by the United States District Court for the District of Maryland,

ORDERED:

(1) that defendant Joseph Daniel Edgerton, Jr.'s motion for judgment of acquittal be, and the same hereby is, *Granted;*

(2) that the indictment against him be, and hereby is, *Dismissed.*